[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 26, 2011
JOHN LEY
CLERK

No. 10-14139
_____

D.C. Docket No. 6:08-cv-00073-MSS-KRS

BRIDGET GORDON,
MITCHELL GORDON,
a.k.a. Mitch Gordon,

Plaintiffs - Appellants,

versus

KEVIN BEARY, in his official capacity
as Sheriff of Orange County, Florida,
RONALD WILCOX, in his individual capacity,

Defendants - Appellees,

CITY OF OCOEE, a municipal corporation,
et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 26, 2011)

Before EDMONDSON and PRYOR, Circuit Judges, and HOPKINS,* District Judge.

PER CURIAM:

This appeal concerns whether a deputy sheriff, Ronald Wilcox, is entitled to qualified immunity against Bridget Gordon's complaint that the deputy violated the Fourth and Fourteenth Amendments when he arrested her without probable cause and seized items from her pharmacy that were outside the scope of a search warrant. Gordon also sued the Sheriff in his official capacity. The district court entered a summary judgment in favor of Deputy Wilcox and the Sheriff. We affirm.

## I. BACKGROUND

In 2003, Bridget Gordon owned and operated a pharmacy in Orange County, Florida. Gordon was the only licensed pharmacist at the pharmacy, and she employed Tracy Romano and Betty Horn as clerks and Kathy Brown as a manager.

In early 2003, a joint operation of peace officers from the cities of Ocoee and Winter Garden, Florida, and the Sheriff's Office of Orange County investigated the pharmacy. Ken Taylor, Kevin Marcum, Michael Henry, Donna

*Honorable Virginia Emerson Hopkins, United States District Judge for the Northern District of Alabama, sitting by designation.

Olphie, Bryan Pace, and Brian Satterlee were members of this task force. Ronald Wilcox, a deputy in the Sheriff's Office, also participated in the investigation due to his extensive experience with pharmaceutical crimes.

The task force enlisted several confidential informants to purchase controlled substances from Gordon's pharmacy without a prescription. In June 2003, one informant, Greg Gurley, purchased ten OxyContin pills from Romano without a prescription. OxyContin contains Oxycodone as an active ingredient, and Oxycodone is a Schedule II controlled substance under Florida law, Fla. Stat. § 893.03(2)(a)1.o. In October 2003, another informant, Jonathan Tanner, attempted to purchase controlled substances from the pharmacy without a prescription. Tanner initially stated in a sworn affidavit that he had purchased about 60 hydrocodone pills, a Schedule II controlled substance under Florida law, id. § 893.03(2)(a)1.j., directly from Gordon without a prescription, but Tanner was arrested for faking a drug buy in an unrelated investigation two days later. Upon his arrest, Tanner confessed to Agents Henry and Olphie that he had also faked his purported purchase from Gordon.

In January 2004, Marilyn Meyer purchased 83 grams of controlled substances from Horn without a prescription. The task force arrested Meyer, and Deputy Wilcox questioned her. Meyer stated that she had procured controlled

3

substances without a prescription from the technicians at Gordon's pharmacy many times. Meyer also stated that she thought that the technicians obtained permission from Gordon to dispense the controlled substances without a prescription, but she did not know. Meyer agreed to work as a confidential informant, and she later purchased 100 hydrocodone pills from Romano without a prescription.

On January 13, 2004, Deputy Wilcox prepared an arrest warrant for Gordon for the crime of trafficking in hydrocodone. To establish probable cause, Wilcox relied on Tanner's and Meyer's purchases and Meyer's statement. Wilcox did not mention Tanner's recantation in the warrant. He explained that, when he executed the warrant, he knew about Tanner's arrest for faking a controlled buy in an unrelated investigation, but did not know that Tanner had recanted his sworn statement about purchasing pills directly from Gordon. Wilcox also prepared a search warrant for Gordon's pharmacy to allow agents to seize, among other things, "controlled substances," "prescriptions of controlled substances," "records pertaining to the illegal sale and distribution of controlled substances," and "paraphernalia used in weighing, packaging and concealment of controlled substances." A judge approved and signed both warrants.

4

Deputy Wilcox executed the warrants on January 14, 2004. He entered Gordon's pharmacy with several officers, placed Gordon and Romano in custody, and searched the pharmacy. The Florida Department of Health conducted an administrative inspection of the pharmacy simultaneously, and the inspection revealed numerous deficiencies and violations of Florida law, including mislabeled medications, expired medications in the active stock of the prescription department, and unclean and unsanitary premises.

During the search, officers seized items beyond the scope of the search warrant. Gordon contends that these items included unopened cabinets, cases of expired medicine, miscellaneous drugs, non-controlled prescriptions, tampons, penicillin, vitamins, saline, pimple cream, personal photographs, her children's birth certificates and report cards, and amniocentesis. Deputy Wilcox and Sergeant Marcum later testified that they could not remember whether they had seized some of these items, but they did not deny Gordon's contentions. Wilcox completed a record that corroborates that he and the other officers seized entire cabinets, non-controlled scripts and pills, and miscellaneous documents and paperwork. In 2009, the Sheriff's Office still had in its possession some of the items seized on January 14, 2004, including drugs, containers, paperwork, and "thousands of forged prescriptions."

Deputy Wilcox explained that the seizures were necessary due to the poor conditions of the pharmacy:

> I and the Department of Health and other agents . . . went through the cabinets and found inside the cabinets expired medications commingled with medications that were not expired. We found cigarettes, rat defecation, rodent defecation. We found dead roaches. We found bottles with pink, purple, green, black, white pills. We found no organization. I had experts from the Department of Health direct me to seize all of the medications that were on the premises, and I was prepared to do so whether they had asked me to [or] not for public safety. . . . I've seen restroom[s], public restrooms cleaner than that pharmacy. Drawers were opened up, and we found rat hairs.

Sergeant Marcum explained that "anything that pertained to pills or scripts was taken," despite whether or not it was a controlled substance, "because of the mess that was there." He added that the seized items were "taken to our property section where we could go through it all instead of being in that nasty pharmacy to go through the pills."

On July 6, 2004, Gordon was charged with trafficking in hydrocodone, Fla. Stat. § 893.135(1)(c)1.c. The State later declined to prosecute, and dismissed the charges. On October 28, 2004, Gordon executed an assignment of assets to Cardinal Health 103, Inc. Cardinal Health filed in the state court a Notice of Interest in the property seized from Gordon's pharmacy "predicated upon an absolute assignment."

6

On May 31, 2005, a judge ordered the Sheriff to release all property seized on January 14, 2004, that related to Gordon's criminal charges except for $60,894.68 in cash, which remained subject to a forfeiture action. The order acknowledged that "Cardinal Health has a valid assignment by [Gordon] in this cause assigning to it all property seized by [the] Orange County Sheriff's Office." Gordon later acknowledged in a settlement agreement with Cardinal Health that she had "assigned to Cardinal [Health] certain of [her] assets, including [her] rights, titles and interests in and to property seized by the Sheriff."

Gordon and her husband, Mitchell, filed a complaint against Deputy Wilcox, the Sheriff in his official capacity, and others in state court on August 3, 2007. Wilcox and the Sheriff removed the action to the district court, and the parties stipulated to the dismissal of all other defendants. In a second amended complaint, the Gordons asserted federal and state claims against Wilcox and the Sheriff, including violations of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983, false arrest, conversion, and loss of consortium. The district court granted Wilcox and the Sheriff a summary judgment.

## II. STANDARD OF REVIEW

"We review de novo the district court's disposition of a summary judgment motion based on qualified immunity, resolving all issues of material fact in favor

of Plaintiffs and then answering the legal question of whether Defendants are entitled to qualified immunity under that version of the facts." West v. Tillman, 496 F.3d 1321, 1326 (11th Cir. 2007).

### III. DISCUSSION

We divide our discussion in three parts. First, we address Bridget Gordon's federal claims against Deputy Wilcox. Second, we address Gordon's federal claims against the Sheriff. Third, we address the Gordons' state claims.

*A. Deputy Wilcox Enjoys Qualified Immunity Against Gordon's Federal Claims.*

Gordon argues that Deputy Wilcox violated her clearly established federal rights when he arrested her without probable cause, and seized items outside the scope of the search warrant. The district court granted Wilcox summary judgment based on qualified immunity.

"'Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right.'" Crenshaw v. Lister, 556 F.3d 1283, 1289 (11th Cir. 2009) (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008)). If an official establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to prove that the official's conduct violated a federal right and that the right was clearly

established.  Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010).

Because it is undisputed that Deputy Wilcox was acting within the scope of his

discretionary authority, the burden shifted to Gordon to present evidence that

Wilcox violated her clearly established federal rights.  Because Gordon failed to

satisfy that burden, Wilcox enjoys qualified immunity against her federal claims.

### 1.  Deputy Wilcox Did Not Violate a Federal Right of Gordon's When He Arrested Her Because Probable Cause Supported the Arrest.

Gordon argues that Deputy Wilcox lacked probable cause for her arrest.

The Fourth Amendment to the United States Constitution forbids "unreasonable

searches and seizures."  U.S. Const. amend. IV.  An arrest is a seizure of the

person, California v. Hodari D., 499 U.S. 621, 624, 111 S. Ct. 1547, 1549–50

(1991), and the reasonableness of an arrest is "determined by the presence or

absence of probable cause for the arrest," Skop v. City of Atlanta, Ga., 485 F.3d

1130, 1137 (11th Cir. 2007).  An officer has probable cause to arrest if the facts

within his knowledge or about which he had reasonably trustworthy information

would allow a prudent man to believe reasonably that a suspect had committed or

was committing an offense.  Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir.

2003).  "To receive qualified immunity protection, an officer 'need not have actual

probable cause but only "arguable probable cause,"'" which requires us to

9

determine "'whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed.'" Id. (quoting Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997)).

Deputy Wilcox's affidavit in support of Gordon's arrest warrant established probable cause for her arrest. Even if we credit Tanner's inconsistent testimony in favor of Gordon, Wilcox's accurate summaries of Meyer's purchase and subsequent statement in the affidavit were sufficient to allow a prudent man to believe reasonably that Gordon had committed or was committing an offense. See Holmes, 321 F.3d at 1079. The description of Tanner's purported buy in the affidavit was "[un]necessary to the finding of probable cause" because "the affidavit's remaining content [was] []sufficient to establish probable cause." Franks v. Delaware, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 2676 (1978). Wilcox did not violate Gordon's federal rights when he arrested her.

 2. Deputy Wilcox Did Not Violate a Federal Right of Gordon's That Was Clearly Established When He Seized Items Outside the Scope of the Search Warrant.

Gordon argues that Deputy Wilcox seized items outside the scope of the search warrant, including non-controlled medications and personal items, but to abrogate Wilcox's qualified immunity, Gordon had to establish that (1) Wilcox's seizure violated a federal right (2) that was clearly established, Case v. Eslinger,

10

555 F.3d 1317, 1325–26 (11th Cir. 2009). We are "permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009). Because Gordon's claim is one "in which it is plain that a constitutional right [was] not clearly established," id. at 237, 129 S. Ct. at 818, our analysis begins and ends with the second element of the qualified immunity inquiry. See id. at 243–44, 129 S. Ct. at 822 ("An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment.").

The inquiry whether a federal right is clearly established "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) (internal quotation marks omitted) (quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004)). "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." Id. "'The critical inquiry is whether the law provided [the officer] with "fair warning" that [his] conduct violated the Fourth Amendment.'" Id. (quoting McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir. 2007) (quoting

11

Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002))). We must "look[] only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—[to] determine whether the right in question was clearly established at the time of the violation." Id.

"Where[] . . . 'an officer who is executing a valid search for one item seizes a different item,' [the Supreme] Court rightly 'has been sensitive to the danger . . . that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will.'" Minnesota v. Dickerson, 508 U.S. 366, 378, 113 S. Ct. 2130, 2138 (1993) (fourth alteration in original) (quoting Texas v. Brown, 460 U.S. 730, 748, 103 S. Ct. 1535, 1546–47 (1983) (plurality opinion) (Stevens, J., concurring in judgment)). "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Marron v. United States, 275 U.S. 192, 196, 48 S. Ct. 74, 76 (1927); see also Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 394 n.7, 91 S. Ct. 1999, 2004 n.7 (1971) ("[T]he

Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant.").

We have recognized that "[t]he seizure of items not covered by a warrant does not automatically invalidate an otherwise valid search." United States v. Schandl, 947 F.2d 462, 465 (11th Cir. 1991). "The crucial inquiry is always 'whether the search and seizures were reasonable under all the circumstances.'" Id. (quoting United States v. Wuagneux, 683 F.2d 1343, 1352 (11th Cir. 1982)). "Such things as the scope of the warrant, the behavior of the searching agents, the conditions under which the search was conducted, and the nature of the evidence being sought must be considered in determining whether or not the search was reasonable." Id.; see also Maughon v. Bibb Cnty., 160 F.3d 658, 660 (11th Cir. 1998) ("Negligent or innocent mistakes do not violate the Fourth Amendment."). We have also held it reasonable for agents to remove intact files, books, and folders when a particular document within the file was identified as falling within the scope of the warrant because "[t]o require otherwise 'would substantially increase the time required to conduct the search, thereby aggravating the intrusiveness of the search.'" Wuagneux, 683 F.2d at 1353 (quoting United States v. Beusch, 596 F.2d 871, 876–77 (9th Cir. 1979)).

13

In Schandl, we held searches reasonable, even though some of the items seized were outside the scope of the warrants, because "the vast majority of the documents seized were within the scope of the warrants[,] [and] [i]t was inevitable that some irrelevant materials would be seized." 947 F.2d at 465. Schandl was charged with tax evasion. Id. at 464. Internal Revenue Service agents searched Schandl's home and office based on valid search warrants for information "relating to any financial transactions" of Schandl. Id. at 465. Schandl challenged the validity of the searches because "agents read love letters and seized personal documents, some of which were not relevant to the[] proceedings," id., including "documents concerning his son's rhinoplasty, a computer disc containing a bible home study course, a rolodex, a box of letters from his mother and father, tax protester manuals and other personal items," id. at 464, but we upheld the searches and seizures as reasonable, id. at 465.

Gordon fails to explain how Deputy Wilcox violated her clearly established federal right. Our precedent in Schandl provided Wilcox with a standard of reasonableness that accounted for the "conditions under which the search was conducted[] and the nature of the evidence being sought." Id. Wilcox explained that he and the other agents "found no organization" in the pharmacy and seized non-controlled medications after they "found inside the cabinets expired

14

medications commingled with medications that were not expired[,] . . . cigarettes, rat defecation, rodent defecation[,] . . . dead roaches[,] . . . [and] bottles with pink, purple, green, black, [and] white pills." Sergeant Marcum explained that "[t]here were so many pills in drawers that were just laying there that [he] didn't know what [were] good pills and what were bad pills." Marcum added that "anything that pertained to pills or scripts was taken," despite whether or not it was a controlled substance, "because of the mess that was there. . . . Everything . . . was taken to [the] property section where [the agents] could go through it all instead of being in that nasty pharmacy to go through the pills." Wilcox recorded the condition of the pharmacy in a video that we have reviewed. In the light of this record of unsanitary conditions, the nature of the evidence being sought, and our decision in Schandl, we cannot say that the seizure of some non-controlled medications and personal items from Gordon's pharmacy violated her clearly established federal right.

*B. Gordon's Federal Claims Against the Sheriff Fail as a Matter of Law.*

Gordon asserts claims for municipal liability against the Sheriff under section 1983 on the ground that "Wilcox's wrongdoing grew out of the Sheriff's [O]ffice custom, policy, or practice." Gordon's claims fail to the extent that they are based on her arrest and the alleged withholding of property after the dismissal

15

of her criminal charge because she has not established a constitutional violation on those grounds. See Case, 555 F.3d at 1328. Gordon also asserts a claim based on the seizure of items outside the scope of the search warrant, which we must address on the merits.

The district court granted summary judgment in favor of the Sheriff after it determined that Gordon had failed to establish a violation of her federal rights, but we can affirm the district court on any ground supported by the record, Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234 (11th Cir. 2010). The parties fully briefed on summary judgment whether the Sheriff had acted with deliberate indifference to Gordon's federal rights when he allegedly failed to train and supervise his deputies about the law of search and seizure. The record contains evidence of only a single purported constitutional violation, not the "pattern of similar constitutional violations by untrained employees [that] is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," Connick v. Thompson, 563 U.S. --, --, 131 S. Ct. 1350, 1360 (2011) (quoting Bd. of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409, 117 S. Ct. 1382, 1391 (1997)). The record is also undisputed that Deputy Wilcox attended "approximately thirty classes on searches and seizures" during his career with the Sheriff's Office.

Because the record fails to support Gordon's allegations of deliberate indifference, we affirm the summary judgment in favor of the Sheriff on this alternative ground.

### C. The Gordons' State Claims Against Deputy Wilcox and the Sheriff Fail as a Matter of Law.

The Gordons' claims under state law fail. Bridget Gordon alleged claims for false arrest and conversion, and her husband alleged a claim for loss of consortium. We address each in turn.

Bridget Gordon argues that "either Wilcox or the Sheriff is liable for false arrest and summary judgment must be reversed" but that argument fails. Probable cause is an affirmative defense to a claim for false arrest, City of St. Petersburg v. Austrino, 898 So. 2d 955, 957 (Fla. Dist. Ct. App. 2005), and we have explained that probable cause supported Gordon's arrest. See Rankin v. Evans, 133 F.3d 1425, 1431 (11th Cir. 1998) ("[T]he standard for determining the existence of probable cause is the same under both Florida and federal law[] . . . .").

Gordon's claim for conversion against the Sheriff likewise fails. "'[T]he essence of an action for conversion is not the acquisition of property by the wrongdoer, but rather the refusal to surrender the possession of the subject personalty after demand for possession by one entitled thereto.'" Joseph v. Chanin, 940 So. 2d 483, 487 (Fla. Dist. Ct. App. 2006) (quoting Murrell v. Trio

Towing Serv., Inc., 294 So. 2d 331, 332 (Fla. Dist. Ct. App. 1974)).  Gordon concedes that she did not demand return of the seized property before she executed an assignment of assets in favor of Cardinal Health, which included her "rights, titles and interests in and to property seized by the Sheriff."  Because Gordon did not demand return of the seized property before her possessory interest in that property terminated, she has no claim for conversion against the Sheriff.

Finally, Mitchell Gordon's claim for loss of consortium fails.  That claim is derivative, and the Gordons have otherwise failed to present a viable claim.

## IV.  CONCLUSION

We **AFFIRM** the grant of summary judgment by the district court.